**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THELMARAE WIERINGA,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | No. 13 C 4998<br><br>Magistrate Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Thelmarae Wieringa filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

**I. THE SEQUENTIAL EVALUATION PROCESS**

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on September 15, 2009, alleging that she became disabled on February 6, 2009, because of sleep apnea, diabetes, chronic back pain, depression, COPD, thyroid disease, restless leg syndrome, and sinusitis. (R. at 24, 112). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 24, 106–23). On December 20, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 24, 53–105). The ALJ also heard testimony from Grace Gianforte, a vocational expert (VE). (*Id.* at 24, 53–105, 166).[2]

The ALJ denied Plaintiff's request for benefits on January 27, 2012. (R. at 24–36). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from February 6, 2009, her alleged onset date, through March 31, 2011, her date last insured (DLI).[3] (*Id.* at 26). At step two, the ALJ found that Plaintiff's sleep apnea, diabetes mellitus, asthma, and degenerative disc disease of the lumbar spine are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 27–28).

---

[2] The hearing transcript incorrectly refers to the VE as "Janport." (*Compare* R. at 53, 54, 97 *with id.* at 24, 166).

[3] The ALJ determined that Plaintiff last met the insured status requirements of the Act on March 31, 2011. (R. at 26). Therefore, Plaintiff must establish that she was disabled between February 6, 2009, and March 31, 2011, in order to qualify for benefits. *Bjornson v. Astrue*, 671 F.3d 640, 641 (7th Cir. 2012) ("only if [claimant] was disabled from full-time work by [her last insured] date is she eligible for benefits").

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that she can perform light work as defined in 20 C.F.R. § 404.1567(b) except she

> can never climb ladders, ropes, or scaffolds, and can only occasionally climb ramps and stairs and balance. [Plaintiff] should avoid concentrated exposure to extreme cold and heat as well as to wetness and/or humidity. [Plaintiff] should avoid concentrated exposure to pulmonary irritants and should not work directly with hazardous machines with moving mechanical parts. [Plaintiff] should not work in high, exposed places, and [Plaintiff] should not drive motor vehicles. [Plaintiff] is able to understand, remember, and carry out detailed instructions.

(R. at 28). At step four, the ALJ determined that through her date last insured, Plaintiff was unable to perform any past relevant work. (*Id.* at 34). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that through her date last insured, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including clerical stock checker, attendant, and counter attendant. (*Id.* at 35). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act, at any time from February 6, 2009, the alleged onset date, through March 31, 2011, the date last insured. (*Id.*).

The Appeals Council denied Plaintiff's request for review on October 26, 2012. (R. at 8–11). Plaintiff now seeks judicial review of the ALJ's decision, which stands

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).[5]

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail

---

[5] Plaintiff filed a subsequent application for SSI with the Social Security Administration, and the claim was approved with an onset date of February 27, 2014. (Am. Compl. ¶ 8). Accordingly, Plaintiff is seeking judicial review only for the period of February 6, 2009, through February 26, 2014. (*Id.* ¶ 9).

and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff has suffered from depression and anxiety on and off since 2003, when she was placed on a series of antidepressants. (R. at 913). Her Zoloft medication worked fine until 2005, and then became ineffective.[6] (*Id.*). In July 2008, she complained of depression and anxiety. (*Id.* at 414). In November 2008, Plaintiff reported

---

[6] Zoloft (sertraline) is used to treat depression, panic disorder, and anxiety disorders. <www.drugs.com>

an anxious mood, especially during her periods of insomnia. (*Id.* at 354, 374). In June 2009, she reported a history of anxiety, along with occasional depression. (*Id.* at 282–83).

On December 18, 2009, Mark Conard, Ph.D., performed a mental status consultative examination on behalf of the Commissioner. (R. at 544–45). Plaintiff reported a history of depression and anxiety attacks, which were first diagnosed in 2002. (*Id.* at 544). She denied current suicidal ideations. (*Id.*). Dr Conard found Plaintiff to be alert, attentive, and cooperative. (*Id.*). Her mood was calm, with an appropriate affect. (*Id.*). Her thought process was organized and oriented to person, place and time, and her immediate and remote memory fair. (*Id.*). Plaintiff struggled to complete serial 7s and simple calculations. (*Id.* at 544–45). Dr. Conard diagnosed major depressive disorder, recurrent, moderate, and assigned a Global Assessment of Functioning (GAF) score of 66.[7] (*Id.* at 545). He opined that Plaintiff is functioning within the average range of general intellectual ability and is able to manager her own funds. (*Id.*).

---

[7] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM-IV*). A GAF score of 61–70 indicates some mild symptoms (e.g., depressed mood and mild insomnia or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within household), but generally functioning well, has some meaningful interpersonal relationships. *Id.* at 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

On February 4, 2010, S. Hill, Ph.D., a nonexamining DDS doctor, reviewed the file and completed a Psychiatric Review Technique (PRT) form. (R. at 570–83). Based primarily on Dr. Conard's report, Dr. Hill concluded that Plaintiff has mild difficulties in maintaining concentration, persistence or pace. (*Id.* at 573, 580, 582). On August 24, 2010, Towfig Argmand, M.D., another nonexamining DDS doctor, affirmed Dr. Hill's conclusions. (*Id.* at 598–600).

On September 15, 2010, Sushma Ragnavendra, M.D., diagnosed depression and prescribed fluoxetine 20mg.[8] (R. at 266–67, 849). On March 7, 2011, Plaintiff reported feeling depressed, hopeless, and lacking motivation. (*Id.* at 862). Dr. Ragnavendra referred her for counseling, three times weekly. (*Id.* at 266, 862). On March 14, 2011, Julian Ungar-Sargon, M.D., diagnosed panic and anxiety disorder. (*Id.* at 824).

On June 14, 2011, Plaintiff began treating with Porter-Starke Services. (R. at 903). She presented with anxiety, expansive mood, and disjointed speech patterns. (*Id.*). She reported recurrent depressive symptoms, most notably anger and irritability, and occasional panic attacks. (*Id.*). Plaintiff admitted to occasional passive suicidal thoughts but denied current ideations. (*Id.*). She reported short term memory problems, difficulty concentrating, and frequent confusion. (*Id.* at 903, 906). She noted that Dr. Ragnavendra had recently increased her Prozac dosage after it became ineffective in controlling her symptoms. (*Id.* at 903). On a mental status exam-

---

[8] Prozac (fluoxetine) is used to treat major depressive disorder and panic disorder. <www.drugs.com>

ination, Plaintiff's mood was stressed and elevated. (*Id.* at 904). Samir Gupta, M.D., diagnosed depressive disorder NOS, provisionally diagnosed bipolar disorder, assessed Clinical Global Impression severity at 5,[9] and assigned a GAF score of 54.[10] (*Id.* at 905). Dr. Gupta recommended weekly individual therapy. (*Id.* at 905–06).

On June 30, 2011, Plaintiff complained of depression, anxiety, lack of motivation, and lack of energy. (R. at 913). She stated that Prozac no longer controls her symptoms. (*Id.*). On examination, she had appropriate affect and mood, intact memory, average intelligence, and preserved judgment and insight. (*Id.* at 914). Daniel Kim, M.D., diagnosed major depression, recurrent, and dysthymic disorder, with a guarded prognosis, and assigned a GAF score of 50–55.[11] (*Id.*). Dr. Kim increased her Prozac dosage and referred her to a therapist for psychotherapy. (*Id.* at 915).

On July 6, 2011, Plaintiff presented as tired, depressed, very distressed, desperate, and hostile. (R. at 907–08, 910). She reported recurrent panic attacks and confusion. (*Id.* at 908). On August 17, 2011, Plaintiff reported increased irritability and passive thoughts of self-harm. (*Id.* at 910). She denied current suicidal ideations,

---

[9] The Clinical Global Impression (CGI) rating scales "are commonly used measures of symptom severity, treatment response and the efficacy of treatments in treatment studies of patients with mental disorders." <en.wikipedia.org/wiki/Clinical_Global_Impression> A severity score of 5 indicates that the patient is moderately mentally ill. *Id.*

[10] A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV* at 34.

[11] A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV* at 34.

but admitted to punching walls in her home out of uncontrolled anger. (*Id.*). She reported difficulty with memory and concentration. (*Id.*). On August 19, 2011, Dr. Gupta referred Plaintiff to outpatient therapy because of her limited financial resources. (*Id.* at 912).

## V. DISCUSSION

**A. The RFC Did Not Properly Account for Plaintiff's Mental Impairment**

The ALJ determined that Plaintiff has sleep apnea, diabetes mellitus, asthma, and degenerative disc disease of the lumbar spine. (R. at 26). The ALJ also concluded that Plaintiff's "medically determinable mental impairment of depression did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and was therefore nonsevere." (*Id.* at 26–27). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform a limited range of light work.[12] (*Id.* at 28).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR)[13] 96-8p, at *2 ("RFC is an

---

[12] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

[13] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations,

administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court concludes that the ALJ failed to fully consider the effects of Plaintiff's mental illness on her ability to work. The ALJ adopted the PRT completed by the DDS doctor in February 2010 and "limited [Plaintiff] to understanding, remembering and carrying out detailed instructions versus complex." (R. at 33). Under the circumstances, the ALJ's decision to merely

---

the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

limit Plaintiff to carrying our detailed versus complex instructions is not supported by substantial evidence.

First, the ALJ erred by handpicking which evidence to evaluate while disregarding other critical evidence. *Scrogham v. Colvin*, 765 F.3d 685, 696–99 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). From September 2010 through July 2011, Plaintiff's treating physicians diagnosed major depression, dysthymic disorder, anxiety, and panic disorder. (R. at 824, 905, 914). Major depressive disorder is characterized by "decreased physical, social, and role functioning." *DSM-IV* at 371. Some people with major depressive disorder "have isolated episodes . . . , whereas others have clusters of episodes, and still others have increasing frequent episodes as they grow older." *Id.* at 372.[14] Dysthymic disorder is characterized by "a chronically depressed mood that occurs for most of the day more days than not for at least 2 years." *DSM-IV* at 376. "During periods of depressed mood, at least two of the following additional symptoms are present: poor appetite or overeating, insomnia, or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness." *Id.* at 377. A panic disorder is characterized by recurrent panic attacks "in which there is the sudden onset of intense apprehension, fearfulness, or terror, often associated with feelings of impending doom. During these attacks, symptoms such as shortness of breath, palpi-

---

[14] *See also* <http://en.wikipedia.org/wiki/Major_depressive_disorder> ("The course of [major depressive] disorder varies widely, from one episode lasting weeks to a lifelong disorder with recurrent major depressive episodes.").

tations, chest pain or discomfort, chocking or smothering sensations, and fear of 'going crazy' or losing control are present." *Id.* at 429.

The Commissioner contends that Plaintiff failed to demonstrate any additional mental functional limitations beyond those identified in the PRT. (Resp. 5). On the contrary, Plaintiff consistently complained of feeling depressed, hopeless, unmotivated, lethargic, uncontrollably angry, irritable, and confused. (R. at 862, 903, 910, 913). She reported recurrent panic attacks and passive suicidal thoughts. (*Id.*). Plaintiff's treating physicians observed anxiety, expansive, stressed and elevated mood, disjointed speech patterns, depression, desperation, and hostility. (*Id.* at 903, 904, 907–08, 910). They prescribed anti-depressant and anti-anxiety medications, and the dosages were increased after they became ineffective. (*Id.* at 266–67, 849, 903, 914, 915). Plaintiff's GAF was assessed at 54 and 50–55. (*Id.* at 905, 914). Her physicians recommended weekly counseling and psychotherapy. (*Id.* at 266, 862, 905–06, 912, 915). The ALJ cannot discuss only those portions of the record that support her opinion. *See Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). Instead, the ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evi-

dence that favors his or her decision. *See Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994).

The Commissioner contends that since all of the Parker-Starke Services treatment notes postdate Plaintiff's date last insured,[15] the ALJ did not have to consider them. (Resp. 3, 4). But the ALJ did not rely on this reason in her decision, and the Court must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *accord Hanson v. Colvin*, 760 F.3d 759, (7th Cir. 2014) ("We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly."). In any event, Seventh Circuit precedent clearly requires the ALJ to "consider all relevant evidence," including post-DLI evidence. *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010); *see Kazmi v. Astrue*, No. 11 C 6123, 2012 WL 5200083, at *7–8 (N.D. Ill. Oct. 22, 2012) (remanding where ALJ failed to consider post-DLI evidence); *Free v. Astrue*, No. 09 C 6313, 2011 WL 2415012, at *7–8, *10 (N.D. Ill. June 10, 2011) (same). And here, Plaintiff was diagnosed with depression and anxiety as early as 2003, and again in December 2009, September 2010, and March 2011, dates which all predate her date last insured. (R. at 266–67, 545, 824, 849, 913).

Second, the ALJ erroneously concluded that Plaintiff's treatment notes were "generally normal." (R. at 33). On the contrary, in March 2011, after Plaintiff had

---

[15] Plaintiff's date last insured was March 31, 2011 (R. at 26), and she began treatment with Parke-Starke on June 14, 2011 (*id.* at 903).

been taking Prozac for six months, Dr. Ragnavendra referred Plaintiff to mental health counseling, three times weekly, and increased Plaintiff's Prozac dosage. (*Id.* at 266–67, 849, 862, 903). On June 14, 2011, Plaintiff presented with anxiety symptoms, an expansive, stressed and elevated mood, and disjointed speech patterns, and Dr. Grupta recommended weekly individual therapy. (*Id.* at 903–006). On June 30, 2011, Dr. Kim diagnosed major depression, recurrent, and dysthymic disorder, gave a guarded prognosis,[16] increased the Prozac dosage, and referred Plaintiff for psychotherapy. (*Id.* at 914–15). On July 6, 2011, Plaintiff presented as tired, depressed, very distressed, and hostile. (*Id.*at 907–08, 910). Because mental illness tends to be episodic, the ALJ cannot extrapolate from days where Plaintiff seems to be doing better to conclude that she has improved her condition. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("But by cherry-picking [the treating psychiatrist's] file to locate a single treatment note that purportedly undermines her overall assessment of [the claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness. As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.") (citations omitted); *Bauer*, 532 F.3d at 609 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough

---

[16] "Guarded prognosis refers to a prognosis given by a physician when the outcome of a patient's illness is in doubt."
<http://connection.ebscohost.com/c/reference-entries/21229874/guarded-prognosis>

that she could work, and half the time she is not. Then she could not hold down a full-time job.").

The ALJ erroneously concluded that because Plaintiff's GAF score "only reflects a specific moment in time and is highly depending on [Plaintiff's] current situation, it provides no indication of [Plaintiff's] overall level of functioning over an extended period." (R. at 33). While the American Psychiatric Association no longer uses the GAF metric, *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014), at the time of Plaintiff's psychological evaluations, clinicians still used GAF scores to indicate a "clinician's judgment of the individual's overall level of functioning." *DSM-IV* at 32. Here, Plaintiff's GAF score of 50–54 indicates moderate to serious symptoms, including suicidal ideations and serious impairment in social and occupational functioning. *DSM-IV* at 34. It's true that GAF scores are not *dispositive* of Plaintiff's disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that the GAF score does not necessarily reflect doctor's opinion of functional capacity because the score measures severity of both symptoms *and* functional level). Nevertheless, Plaintiff's GAF scores are *evidence* suggesting a far lower level of functioning than the ALJ assigned. *Yurt v. Colvin*, 758 F.3d 850, 859–60 (7th Cir. 2014) (Although the ALJ was not required to give any weight to individual GAF scores, "the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC."). And,

as discussed above, the ALJ was obligated to consider this post-DLI evidence, especially since the GAF scores postdated the DLI by less than three months. *Cf. Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008) (post-DLI evidence indicating that claimant was currently disabled provided little if any evidence that she was disabled *15 years* prior).

The treating psychiatrists' diagnoses were validated by other medical opinions. Dr. Ragnavendra, Plaintiff's general practitioner diagnosed depression, prescribed Prozac, and referred her for counseling. (R. at 266–67, 849, 862). Dr. Ungar, Plaintiff's neurologist, diagnosed panic and anxiety disorder.[17] (*Id.* at 824). And Dr. Conard, who performed a consultative examination in November 2009, diagnosed major depressive disorder, recurrent. (*Id.* at 545).

Finally, the ALJ's reliance on the State agency consultants' evaluation is not supported by substantial evidence. The ALJ gave "significant weight to the opinions of the State agency physician's Psychiatric Review Technique as it is consistent with the evidence." (R. at 34). But the State agency consultant issued his evaluation without having reviewed significant medical evidence. For example, none of Plaintiff's psychiatric treatments at Porter-Starke Services were in the file when Dr. Hill

---

[17] The Commissioner suggests that the ALJ did not need to consider Dr. Ungar's diagnosis because he "was a neurologist and treated Plaintiff for her physical impairments." (Resp. 4). On the contrary, while Dr. Ungar was not a mental health specialist, as a medical doctor, he was "an acceptable medical source," whose diagnosis was entitled to due consideration. 20 C.F.R. § 404.1513; *see also Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."); *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

performed his mental disability evaluation. Nor did Dr. Hill have Dr. Ungar's diagnosis of panic and anxiety disorder when he completed the PRT form.

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall seek appropriate expert medical advice to determine what effects Plaintiff's mental illnesses have on her ability to work. The ALJ shall then reassess Plaintiff's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted); *see Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) ("We keep telling the Social Security Administration's administrative law judges that they have to consider an applicant's medical problems in combination.") (collecting cases). The RFC shall be "expressed in terms of work-related functions" and include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. SSR 96-8p.

**B. Other Issues**

Because the Court is remanding on the mental impairment issue, the Court chooses not to address Plaintiff's other arguments. Nevertheless, on remand, after fully considering the effect of Plaintiff's mental illness on her ability to work, the ALJ shall reassess the weight to be given to Dr. Ungar's opinion. If the ALJ finds "good reasons" for not giving Dr. Ungar's opinion controlling weight, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "consider the length, nature, and extent of the treating relationship, frequency of examination, the physician's specialty, they types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining the weight to give Dr. Ungar's opinion. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there were jobs that existed in significant numbers that Plaintiff could have performed through the date last insured.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: March 26, 2015

*Mary M Rowland*

MARY M. ROWLAND
United States Magistrate Judge